BELCHER *v.* RANNEY.

1. CONVERSION—EVIDENCE—EXPERT TESTIMONY.
    In an action against a postmaster for the conversion of personal property left in the post office by the retiring postmaster, where the record shows that plaintiff had sufficient knowledge of values to testify thereto, his testimony was properly received.

2. SAME—WHAT CONSTITUTES—DEMAND—INSTRUCTIONS.
    The trial judge properly instructed the jury that if a reasonable time' had elapsed, that a lawful demand had been made, and that the defendant had converted the property, it was their duty to find a verdict of guilty.

3. SAME—PARTIAL DEPRIVATION OF PROPERTY SUFFICIENT TO CONSTITUTE.
    Conversion does not necessarily imply a complete and absolute deprivation of property; there may be a deprivation which is only partial or temporary, and where the property of the plaintiff remains in or is restored to him.

Error to Ingham; Collingwood (Charles B.), J. Submitted June 9, 1920. (Docket No. 20.) Decided September 30, 1920.

Case by George L. Belcher against Delbert D. Ranney for the conversion of certain post office fixtures. Judgment for plaintiff. Defendant brings error. Affirmed.

*Thomas, Shields & Silsbee,* for appellant.

*L. B. Gardner,* and *Frank L. Dodge,* for appellee.

MOORE, C. J. In March, 1916, the defendant was notified that he had been appointed postmaster of Leslie. April 7, 1916, he took over the office from the plaintiff. November 17, 1916, this action of trover

was commenced to recover the value of the personal property which was left in the office when there was a change in the postmastership. The case was tried by a jury which rendered a verdict in favor of the plaintiff in the sum of $1,117.92. From a judgment for that amount the case is brought here by writ of error.

There were 17 assignments of error but they may very properly be divided into four groups: 1. That plaintiff was allowed to testify as to values when he was not shown to be an expert. As to this group we shall content ourselves with saying the record shows plaintiff had sufficient knowledge so that his testimony was properly received. The second group of errors relates to the refusal to give eight written requests preferred by defendant. The third group relates to the charge of the court as given, and the remaining group relates to the refusal of the court to direct a verdict for defendant upon the theory that plaintiff had not made a case of trover.

The case is not a complicated one. A rule of the post office department was received in evidence which reads:

"SEC. 350. Postmasters are not required to purchase the equipment of their predecessors. A retiring postmaster should not remove his equipment to the detriment of the public service when such equipment is not purchased by his successor, until the latter has had a reasonable time in which to obtain and install other equipment. Where the equipment of a predecessor is used at offices of the second or third classes, and if not included in a lease to the post office department, and at offices of the fourth class, the postmaster shall pay from his personal funds a reasonable rental for such equipment, the amount to be agreed upon between the parties interested."

Both parties seem to have been content with this rule at first. The record shows that about April 15th

there was a talk between them about the fixtures. When plaintiff offered them to the defendant for $1,200 he was told by the defendant he was not yet ready to buy but wanted to look about. A few days later they had an interview on the street, and on the evening of the same day in the post office building. They reached no conclusion. About the first of June there was an interview between them. The plaintiff testified on the cross-examination, in part, as to this interview:

"I think along the first of June or before the first of June, I saw him again. I may have seen him once before that. I was still in Leslie. At that time I told him I had to go away. I had got a job and would like to have the matter settled up before I went. He told me he would not pay my price. I says: 'I will pick a man and you pick a man and we will leave it to them,' and he said he would pay attention to his own business, he would buy his own stuff, and I says, 'Mr. Ranney that is no way to do, let us act like men and get together and have this furniture—there is no use having two sets of boxes in this town.' He made me a small offer, but I did not consider it an offer. I could not tell you just the price he offered. It was less than $500, and I wanted $1,200. We came to no agreement in June."

The defendant testified in part as to this interview:

"About the first of June or last of May or sometime in May, Mr. Belcher called on me again. He wanted to know what I would give for the fixtures, or what I would not give, and I told him I would give $450. He said 'you get some new fixtures just as quick as you can,' jumped up and walked out."

There was another interview in October, about which the plaintiff and defendant are not agreed. Plaintiff had heard that defendant had bought new fixtures. A Mr. Graham went with the plaintiff and testified as follows:

"I have known Mr. Belcher probably 23 years, and

have known Mr. Ranney pretty nearly as long. In 1916 the last of October or the fore part of November, I went down town one night going to the post office and met Mr. Belcher and he told me he wanted to make a demand on Mr. Ranney and wanted to know if I would go with him. I did so, and Mr. Belcher told Mr. Ranney that he either wanted his fixtures or the money, and that he had a business transaction of his own that he had to settle up and he had to know where he was at, he had to have either the money or the fixtures. Mr. Ranney made no reply to Mr. Belcher. He just stood there kind of mum and grinned a little but didn't say anything. Mr. Belcher told him that he expected to return on the 10 o'clock car and he would like to have an answer before he went back. Mr. Ranney made no further reply."

The defendant testified that as early as August he ordered new fixtures but did not notify the plaintiff of that fact, and in reply to an inquiry said he did not think it was any of his business. The plaintiff had an interview with defendant in November. He made a demand for the fixtures to be delivered immediately. The defendant says he told him he could have his fixtures "if I could get a couple of men to help put up the others," and that a day or two later he notified plaintiff he could have his fixtures. In the meantime this law suit had been commenced. The trial judge charged the jury properly that the burden was upon the plaintiff and as to the three things he must prove to maintain this suit in trover. We quote from his charge as follows:

"It is conceded in this case that defendant was entitled to hold those articles until a reasonable time had elapsed for him, the defendant Ranney, to either secure new fixtures or purchase or rent the fixtures then in the office.

"Now, what constitutes a reasonable time is for your consideration, under all the conditions in this case, the fact that it was used by the public and under the post office laws and regulations, and under the evidence in this case.

"Now the question of reasonable time is up to you. If you find that a reasonable time had elapsed to entitle plaintiff Belcher to immediate possession you will next determine the question, Did plaintiff Belcher make a lawful demand for his property? I will say to you, gentlemen, that to constitute a legal demand of property in this class of cases, it is not necessary for the demanding party to use the word demand, or to specify by name or to give any particular description of the property demanded, but in language which makes known to the party of whom the demand is made that demandant desires possession of the property and informs him by reference or otherwise what property he desires possession of—that is sufficient to constitute a demand. No particular words—what I mean to say by that is, no particular set words are required. If you find, gentlemen, from the evidence, and from a preponderance of it, the plaintiff was entitled to immediate possession, that is, that he had waited a reasonable time and was entitled to immediate possession and that he made the demand, a lawful demand, it then becomes your duty to determine the third question, Did defendant Ranney unlawfully convert the property? To constitute an unlawful conversion, you must find that while the plaintiff was entitled to immediate possession, the plaintiff made a legal demand, and that then defendant under such circumstances refused or neglected to deliver this property to plaintiff.   *   *   *

"Now, gentlemen, if you cannot find under the evidence and by a preponderance thereof, and under the law as I have given it to you, that there was a right to immediate possession, and there was a demand, and that there was a conversion—you have got to find all three, and if you cannot so find under the evidence and under the law, it becomes your duty to return a verdict of not guilty.

"But if you do find a reasonable time had elapsed, that a lawful demand had been made, and that the defendant had converted the property, then it would be your duty to find a verdict of guilty and you would then come to the question of damages."

In *Ingersoll* v. *Barnes*, 47 Mich. 104, Chief Justice MARSTON, speaking for the court, said:

"It was also urged on the part of the plaintiff in error that although a demand had been made for this property before suit brought, yet that there had been no refusal to comply therewith. The refusal or reply to the demand was in writing and as follows: 'You now claim the engine as belonging to you. I neither admit nor deny your claim. I shall not consent to your taking the property, nor shall I forbid your doing so. We are both responsible for our acts and I suppose the law will protect us in our rights and punish us for any unlawful acts which we may do.'

"If a demand for property can thus be answered and not constitute a conversion, it will be easy hereafter to avoid the responsibility which a refusal entails. This in my opinion was sufficient evidence of a conversion to entitle the plaintiff to maintain trover."

In *Daggett* v. *Davis*, 53 Mich. 35, Chief Justice COOLEY, speaking for the court, said:

"But conversion does not necessarily imply a complete and absolute deprivation of property; there may be a deprivation which is only partial or temporary, and where the property of the plaintiff remains in or is restored to him. *Liptrot* v. *Holmes*, 1 Kelly (Ga.), 381, 391; *Fisher* v. *Kyle*, 27 Mich. 454; *Hall* v. *Corcoran*, 107 Mass. 251 (9 Am. Rep. 30). An illustration is where one hires a horse for one use and puts it to another, subsequently returning it to the owner. *Homer* v. *Thwing*, 3 Pick. (Mass.), 492; *Rotch* v. *Hawes*, 12 Pick. (Mass.), 136 (22 Am. Dec. 414); *Crocker* v. *Gullifer*, 44 Me. 491; *Horsely* v. *Branch*, 1 Humph. (Tenn.), 199. The difference between such a case and one in which the property is wholly made away with, is one affecting the damages only; the damages go to the whole value of the property in the one case, and are commonly less in the other. *Wheelock* v. *Wheelwright*, 5 Mass. 104; *Long* v. *Lamkin*, 9 Cush. (Mass.), 361; *Reynolds* v. *Shuler*, 5 Cow. (N. Y.), 323; *Cook* v. *Loomis*, 26 Conn. 483; *Brady* v. *Whitney*, 24 Mich. 154, 156."

See *Stansell* v. *Leavitt*, 48 Mich. 225; *Ashman* v. *Epsteine*, 50 Mich. 360; *Gibbons* v. *Farwell*, 63 Mich.

344; *McDonald* v. *McKinnon*, 92 Mich. 254; *Parnell* v. *Pungs*, 190 Mich. 638.

The issues involved in the instant case were simple ones. We find no reversible error.

The judgment is affirmed, with costs to the plaintiff.

STEERE, BROOKE, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.